# EXHIBIT A

**ELECTRONICALLY FILED**
DOC ID: 16258748
CASE NO: 2022-LA-0000009
DATE: 1/11/2022 11:55 PM
BY: Robin Bach, DEPUTY

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## WINNEBAGO COUNTY, ILLINOIS

| | | |
|---|---|---|
| L.A., by and through her Guardian MAURICE ANDREWS, individually and on behalf of all similarly situated individuals, | ) ) ) ) | |
| | ) | No.     2022-LA-0000009 |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Hon. |
| TAKE-TWO INTERACTIVE SOFTWARE, INC., a Delaware corporation, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| *Defendant.* | ) ) | |

## CLASS ACTION COMPLAINT & JURY DEMAND

Plaintiff, L.A., by and through her Guardian Maurice Andrews ("Plaintiff" or "minor Plaintiff"), brings this Class Action Complaint against Defendant Take-Two Interactive Software, Inc. ("Take-Two" or "Defendant"). Plaintiff allege as follows based on personal knowledge as to Plaintiff' own acts and experiences, and as to all other matters, upon information and belief, including an investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.    This is an action brought by Plaintiff on behalf of herself and others similarly situated due to deceptive and misleading trade practices engaged in by Defendant in marketing and selling "lootboxes" and other in-game items for its online video game series, including NBA 2K and other of Defendant's games, that have been purchased by thousands of individuals, including minors who Defendant prevented from exercising their unrestricted rights under state laws to rescind contracts into which they entered.

2.    Take-Two is an American video game company whose primary business is selling video games, including through its self-owned publishing label, 2K. Take-Two and its subsidiaries

1

are best known for developing games in the 2K franchise, including the video game series NBA 2K. Defendant markets and sells its games, including but not limited to NBA 2K, via software that users download on different device platforms, such as Microsoft Windows, Nintendo Switch, PlayStation 4, PlayStation 5, Xbox One, Xbox Series X/S, Google Stadia, and Apple Arcade. Users running Defendant's games such as NBA 2K on their devices connect to Defendant's servers and other users connected through the internet together to create a simulation of the real-world, *i.e.*, cyberworld. Defendant provides a video game service, *i.e.* an entertainment or recreational service through the internet.

3. This case arises under New York General Business Law §§ 349, 350 and New York General Obligation Law §§ 5-419, as well as common law claims.

4. Defendant's unfair, deceptive, and unlawful practices, including illegal gambling practices, deceive, mislead, and harm consumers. Plaintiff and other consumers have been injured as a result of Defendant's practices, including, but not limited to, having suffered out-of-pocket loss.

5. On their own behalf and on behalf of the proposed Class and Subclasses defined below, Plaintiff seeks equitable and monetary relief, together with costs and reasonable attorneys' fees.

## JURISDICTION AND VENUE

6. This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States, because Defendant is doing business within this State and because Plaintiff's claims asserted herein arise out of Defendant's unlawful in-state actions.

7.      Venue is proper in Winnebago County, Illinois pursuant to 735 ILCS 5/2-101, because Defendant is doing business in Winnebago County, Illinois and thus resides there under § 2-102.

**PARTIES**

8.      At all relevant times, minor Plaintiff L.A. and her Guardian have been residents and citizens of the state of Illinois.

9.      Defendant Take-Two Interactive, Inc. is a Delaware corporation with its principle place of business located in New York, New York. Defendant regularly markets and sells its video games throughout the United States, including in Winnebago County, Illinois.

**COMMON FACTUAL ALLEGATIONS**

I.      **General Background**

    A.      <u>NBA 2K</u>

10.     NBA 2K is a series of basketball simulation games which have been released annually since 1999. NBA 2K's title of its annually released game reflects the next year after the year in which it is released. For example, the game released in 2019 is titled NBA 2K20.

11.     During the relevant time period, all allegations in this complaint are materially identical for the different versions of NBA 2K as Defendant's illegal practices exist in each game.

12.     The NBA 2K series is a multiplatform game which is available on Microsoft Windows, Nintendo Switch, PlayStation 4, PlayStation 5, Xbox One, Xbox Series X/S, Google Stadia, and Apple Arcade.

13.     NBA 2K users have the option to play several different game modes including MyTeam, MyPlayer, and local or online play, all which present the user with different game experiences.

3

14.     The NBA 2K video game series has become one of the most popular games in the marketplace where Defendant recently boasted selling 10 million copies, having 2.3 million daily active users, and recurrent consumer spending that is up 73% year-over-year for its NBA 2K21 game.[1]

15.     Defendant offers NBA 2K at several fixed prices, wherein consumers have the option to purchase the "standard edition" for $59.99 or purchase bundle packages at prices up to $99.99.

16.     The fixed price model, where customers purchase NBA 2K to access its content, is deceptive where customers believe they will have a comprehensive playing experience after their transaction, only to find out the game is littered with microtransactions which are necessary for players, including minors, to advance and compete within the game.

17.     Importantly, Take-Two accumulated $1.39 billion in microtransactions during the fiscal year 2020, accounting for 45% of its net revenues.[2]

B.      <u>Virtual Currency</u>

18.     Defendant derives a significant portion of its revenue through the sale of virtual currency ("VC") and other microtransactions. VC is an in-game currency created by Defendant solely for the NBA 2K universe, and is used by players to purchase MyPlayer attribute upgrades, MyPlayer aesthetics, and many other items including "lootboxes" in the form of MyTeam card packs.

---

[1]     https://www.gamesindustry.biz/articles/2021-05-18-take-two-hits-usd3-37bn-revenue-in-record-year (last accessed Jan. 11, 2022)
[2]     https://www.tweaktown.com/news/72664/take-two-breaks-3-billion-in-revenue-sets-new-all-time-high/index.html (last accessed Jan. 11, 2022)

19.     Critically, VC purchases are non-refundable, regardless of whether the purchaser is a minor, the minor's parent or guardian or another adult, or an individual who has for whatever reason changed their mind about the value of their purchase.

20.     While players can earn VC in-game instead of purchasing it for money, earning VC in the game is difficult, time consuming, and an inconsistent process due to the amount of playtime required and the randomness at which VC is offered as a reward. By making VC inordinately difficult and time consuming to earn, Defendant creates a "paywall" to induce players to purchase VC instead of earning it through play.

21.     The smallest amount of VC a player can purchase is 5,000 VC for $1.99. However, Defendant encourages players to purchase larger quantities of VC by providing discounts on larger amounts. For example, a player could purchase 35,000 VC and receive 10,000 VC as a bonus for $9.99, or purchase 450,000 VC and receive 200,000 VC as a bonus for $99.99, the latter amounting to a value of approximately $150.



22.     Although Defendant could have very easily based microtransactions on actual currency, requiring the conversion of money to VC permitted Defendant to particularly maximize its revenue in several ways. First, the VC system distances the player psychologically from the amount of real-world money he or she has spent within the game. The VC system serves to psychologically distance players from the financial implications of their in-game purchases by disconnecting the expenditure of real money from the products the players end up purchasing with their VC. This is especially the case for minors who may not have a firm understanding of the correlation between the amount of real-world money and VC spent. These transactions are particularly costly as the player has already spent up to $99.99 to purchase the game and then is compelled to complete microtransactions, further increasing their total costs to an exorbitant price to pay to play a single video game.

23.     Defendant implements further pricing control by selling VC in currency packs and setting the price of microtransactions at odd amounts. The amount of VC in a currency pack almost never corresponds evenly to the price of loot and player upgrades. Using this system, Defendant perpetuates a cycle of NBA 2K players constantly needing VC, and never having enough, which leads players to purchase more. This cycle is further perpetuated by Defendant offering "limited time sales" or "specials" on certain loot prices and items, creating a sense of urgency to purchase.

24.     Defendant also encourages player spending by varying the exchange rate at which VC is purchased in different transaction sizes. As previously illustrated, for $1.99 a player can purchase 5,000 VC at an exchange rate of approximately 2,500 VC per dollar, where a $99.99 purchase of 450,000 VC offers an exchange rate of approximately 4,500 VC per dollar.

25.     Finally, Defendant induces players into making more purchases by making the purchase process incredibly easy and convenient. Once a player enters and saves a payment

6

method, that player can purchase VC at any time almost instantly. In practice, that means minors whose parents enter and save their credit and/or debit cards into an NBA 2K account can use their parents' credit/debit cards to make an endless number of purchases. The ease of purchase combined with the constant cycle of introducing new items for purchase, as well as creating a need to purchase VC to advance in the game to remain competitive, results in more purchases.

C.  Digital Content

26.  Broadly speaking, the majority of Defendant's digital content in NBA 2K is related to two separate game modes: (i) MyPlayer and related purchases; and (ii) MyTeam and related purchases..

27.  Defendant's digital content items within the separate game modes include MyPlayer attribute and player upgrades, MyPlayer health upgrades, MyPlayer boosts, MyPlayer aesthetic purchases such as clothes, accessories and emotes, MyTeam marketplace exchanges, and MyTeam "lootbox" card packs.

28.  NBA 2K fails to provide an unrestricted right to seek refunds of any in-game purchases made by minors or any other player, and, in fact, expressly prohibits refunds.

a.  **MyPlayer Content**

29.  In NBA 2K's MyPlayer, a game mode where players create a unique basketball player and use him to compete against other players in a mass multiplayer online role-playing game setting, players are constantly flooded with advertisements, promotions, and marketing schemes that exist in Defendant's virtual reality setting.[3] Defendant has utilized this game mode to induce players into making consistent and significant microtransactions.

---

[3] In MyPlayer, players are dropped into "The Neighborhood" or "The City," depending on which version of NBA 2K they are playing, where they can participate in competitive basketball games against other players online. The Neighborhood or The City are virtual reality settings that exist within the game.

30.     For example, within NBA 2K's The City or The Neighborhood exists a strip mall area where players are provided access to many different stores where they can exchange VC for MyPlayer aesthetics (i.e. in-game player outfits). Players have the option to purchase shoes from the Nike store, clothes from the New Balance store, NBA licensed apparel from the NBA store, or various other stores. Additionally, The City and The Neighborhood are littered with advertisements including virtual billboards, in-game promotions, and limited durational special deals which are included to induce players into making prompt VC purchases, then exchange that VC for items before they expire, while playing in the virtual reality setting. Oftentimes, when a player loads NBA 2K on their gaming platform, a promotional advertisement for a microtransaction special will be the player's first interaction with the game which they will have to close prior to being able to play.

31.     NBA 2K MyPlayer also creates a pay-to-win structure by forcing its users to exchange VC for MyPlayer upgrades and skill boosts.

32.     While players have the ability to earn VC by competing in online games or other game modes within NBA 2K, this method of obtaining VC is difficult, time consuming, and an inconsistent process due to the amount of playtime required and the randomness at which VC are offered as rewards. Thus, upgrading a MyPlayer without purchasing VC is difficult, time consuming, and inefficient.

33.     Players with a higher rated MyPlayer are superior and have a competitive advantage over users with a lower rated MyPlayer. Therefore, players with a higher rated MyPlayer are more successful in their online matches resulting in more wins.

34.     Spending VC on MyPlayer upgrades to improve their rating is extremely costly. Oftentimes, a single attribute point can cost anywhere from a couple hundred VC to thousands of

8

VC. Further, players are tasked with making over a thousand attributed upgrades to complete the process of reaching their MyPlayer's potential.



35.     Pictured above is an example of an NBA 2K 22 MyPlayer where the player has a total of 1,596 attribute points for an overall rating of 97 (maximum overall rating is 99).

36.     Thus, rather than going through the inefficient process of earning VC to upgrade their players, which requires hundreds of hours of gameplay to upgrade over a thousand attribute points, players are compelled to purchase significant amounts of VC to expedite this process in order to be competitive in NBA 2K's The City and The Neighborhood online matches.

37.     Attribute upgrade purchases are one-time transactions, meaning that once a player has upgraded that attribute point for their MyPlayer the user will not have to make the same purchase. However, MyHealth[4] boosts for a player's MyPlayer are temporary upgrades, leading to reoccurring purchases and consistent exchanges of VC for MyPlayer upgrades.

38.     MyHealth boosts consist of basketball skill upgrades and Gatorade stamina upgrades. For example, a player could exchange VC for one boost to their MyPlayer's jump shot

---

[4] MyHealth enables players to temporarily upgrade their MyPlayer's basketball skill and physical abilities in exchange for VC.

rating for one game, or one Gatorade boost to slow down their MyPlayer's energy consumption for one game which increases its stamina.





39.     One boost to a MyPlayer's basketball ability typically costs 200 VC each, where a bundle of ten boosts to that same ability typically costs 1,500 VC, and one Gatorade boost typically costs 500 VC each, where a bundle of ten Gatorade boosts typically costs 3,500 VC.

40.     The MyHealth boost offering further illustrates NBA 2K's pay-to-win structure, where players that consistently purchase VC, and exchange VC for boosts, have a competitive advantage over players who do not purchase VC and exchange it for boosts. Importantly, as the method of earning VC without purchase is difficult, time consuming, and inefficient, players are not able to earn enough VC to consistently boost their MyPlayer without purchasing additional VC from the marketplace, inducing players to submit to Defendant's microtransactions on a regular basis.

41.     Lastly, players, including minors, are also tempted and induced to make immediate purchases when new content is made available for purchase for only a limited time. Defendant runs promotional deals and specials for limited time offerings on digital content such as clothes items, shoes, and other MyPlayer aesthetics which compels players to make these purchases before they become unavailable.

b.     **MyTeam Content**

42.     NBA 2K's MyTeam game mode allows players to create, and compete with, a custom-built team made of past and present real-life representations of NBA players.

43.     Players' MyTeam teams are made up of cards which hold representations of players, contracts, coaches, equipment (such as shoes), jerseys, attribute upgrades, playbooks, and much more. The MyTeam's NBA player roster reflects which cards are currently owned by the player.

11

44.     While cards and the packs which they come in can be earned through in-game rewards by playing MyTeam, or by purchasing them with MyTeam points through an online auction house within the game, the earning of MyTeam points (which can only be used in MyTeam) and unlocking player cards and card packs in the game is difficult, time consuming, and an inconsistent process due to the amount of playtime required and the randomness at which packs and player cards are offered as rewards.

45.     Therefore, the primary method of obtaining cards is through Defendant's "pack market," Defendant's version of what is commonly known as a "lootbox" scheme, where players exchange VC for packs of cards. A lootbox is an in-game virtual item that contains additional random game items that the player can use to progress through the game, or in this case, build their MyTeam.

46.     Defendant, through its card pack lootbox scheme, sells lootboxes which contain items and player cards which are not revealed until after the player purchased the lootbox and thereby committed to an irreversible transaction even though they did not know what items or player cards they would receive. Critically, Defendant obscures the odds of receiving the rarest player cards in its lootboxes, luring players into making more and more purchases on the off-chance that the next lootbox will contain the item or player card they are seeking. In other words, the chances of receiving a valuable in-game item are random.

47.     Further, the rare player cards that purportedly exist in Defendant's lootboxes are generally those which are competitive player cards with better attributes, ratings, and skills which provide MyTeam players with a competitive advantage against their opponents, inducing players to submit to their microtransactions to upgrade their MyTeam.

48.     This system was created to capitalize on and encourage addictive behaviors, akin to gambling. Minors are especially susceptible to these addiction-enhancing elements of game design. The experience of acquiring surprise rewards and the associated excitement of uncovering unexpected in-game items and player cards hold a strong appeal for minors and reinforces their desire to keep playing, keep getting rewards, and continuously submit to Defendant's microtransactions.

49.     The price of card pack lootboxes varies greatly. In some versions of NBA 2K, a single card pack could be any amount between 2,812 VC and 15,000 VC, where bundles of 20 card packs can be purchased for as much as 135,000 VC.

50.     Further, NBA 2K fails to provide an unrestricted right to seek refunds of any in-game purchases made by minors.

        c.      "Ante-Up"

51.     Ante-Up is a game mode within NBA 2K where players, including minors, wager their VC in competitive online basketball games.

52.     Players offer VC at the beginning of each match, which is pooled together with the VC from all players, and award to the winner at the end of the game.

53.     This system was created to capitalize on and encourage addictive behaviors, akin to gambling. Minors are especially susceptible to these addiction-enhancing elements of game design. The experience of gambling VC and the associated excitement of winning VC as a result of the game holds a strong appeal for all players, but especially for for minors, and reinforces their desire to keep playing, keep purchasing and gambling their VC, and continuously submit to Defendant's microtransactions.

### d. NBA 2K In-game Purchases

54.     NBA 2K can be played on different platforms and computing devices including Microsoft Windows, Nintendo Switch, PlayStation 4, PlayStation 5, Xbox One, Xbox Series X/S, Google Stadia, and Apple Arcade. Minors purchase, download, and install NBA 2K, oftentimes with their parents' money, and play on different platforms.

55.     While on its face it appears that Defendant requires that its terms of use be accepted by legal adults 18 years and older, NBA 2K specifically targets minors. An agreement that explicitly requires acceptance by an adult cannot apply to a minor, and minors have a legal right to disaffirm contracts into which they enter.

56.     Minors make in-game purchases, including for example, MyPlayer attribute and player upgrades, MyPlayer health upgrades, MyPlayer boosts, MyPlayer aesthetic purchases such as clothes and accessories, MyTeam marketplace exchanges, and MyTeam lootbox card packs. Minors wanting to refund their microtransactions related to NBA 2K have no means within the game to request a refund. Defendant sells its microtransactions with descriptions stating that they are non-refundable.

57.     Minors make VC purchases without understanding the amounts involved in actual money to-date, that day, that week or that month. Minors make VC purchases through their parent's credit cards and debit cards that were stored on the gaming platforms. Parents and guardians who store credit card information in a gaming platform likely do not realize that those to whom they give access to the platform can use that credit card to make purchases.

58.     Separate from purchases made directly from Defendant, minors can make purchases from third-party marketplaces like the PlayStation Store. VC gift cards are available for use in those marketplaces and minors who receive these gift cards for birthdays, etc., have been

able to use their own money to purchase VC (as opposed to parental money charged on credit cards).

59.     Prior to making the microtransactions, minors are generally not aware of the non-refundable policy for their purchases. Minor Plaintiff and Class members are not buyers who would look for a refund policy at the time of purchase, had one existed.

60.     In many instances, a parent or guardian may not review his or her credit cards, debit cards, and bank account information until months after the purchases occurred and thus would not know of the amounts spent at the time of purchase.

61.     After making those purchases within the NBA 2K ecosystem, minors and their guardians, without retaining counsel, are not aware of a minor's right to disaffirm and get refunds on any and all in-game transactions without any restrictions.

### e.     Defendant Induces Minors to Make Frequent Microtransactions

62.     Defendant induces minors to make purchases by its operation of VC within the NBA 2K ecosystem.

63.     Defendant induces minors by concealing the terms of the microtransactions at the time of purchase by not displaying non-refundability, by displaying non-refundability in very small font, or by providing the terms of the non-refundability through a separate link.[5]

64.     Defendant induces microtransactions by allowing one-click and easy to make in-game purchases within NBA 2K.

65.     Defendant does not give minors enough information to make reasonable and prudent choices with in-game purchases

---

[5] https://www.take2games.com/eula (last accessed Jan. 11, 2022)

66.     Defendant further induces frequent in-game purchases by pushing newer content, promotional deals, and content specials every week. Any purchase already made becomes stale quickly. Additionally, Defendant induces frequent in-game purchases by providing competitive advantages to players that frequently submit to their upgrades, boosts, and lootbox microtransactions.

67.     By operation and policies of the NBA 2K ecosystem, Defendant is benefiting by luring minors into making in-game purchases that test the tolerance levels of parents. In many instances, parents ignore these expenses as one-time expenses at the early stages of using NBA 2K. By disallowing refunds in the NBA 2K ecosystem, while also making one-click purchases in the same ecosystem easy, Defendant is running an unfair system.

    f.      **Defendant Misrepresents Information Related to Microtransactions**

68.     Defendant misleads or misrepresents the applicable law for transactions including microtransactions with minors. Upon information and belief, Defendant knows that in the state of Illinois, and most states nationwide, the law allows minors to disaffirm contracts. Defendant also knows that a minor can disaffirm contracts without any restrictions; the law permits a minor to do so. Yet, Defendant operates a non-refundable policy that misleads, misrepresents, and does not acknowledge a minor's right to obtain a refund.

69.     Before retaining counsel in this action, minor Plaintiff and her Guardian were not aware of a minor's right to disaffirm and request a refund. On information and belief, Defendant's customer support routinely sends emails to players, including minors, stating that in-game purchases are non-refundable.

70.     During the early use of NBA 2K, a parent may not be monitoring his or her own credit card, debit card or bank account information closely. In such instances, the early purchases go undetected for a long period of time.

71.     Defendant misrepresents the actual amounts spent on an in-game purchase by intermediary VC amounts that require difficult calculations to figure out the accurate amounts spent.

72.     Defendant misleads minors by not conspicuously displaying the terms applicable to in-game purchases at the time of such purchases, by displaying non-refundability in very small font at the side of the screen, or by only providing an external link to the terms of purchase. By not including any visibly cautionary language at the time of promoting in-game purchases, Defendant is misleading minor players.

73.     Defendant misrepresents the current value of digital content items by not disclosing when newer related content will be offered minors have no way of knowing, for example, if MyPlayer accessories they are purchasing today will become stale within a day or two, or in a week when newer content is published.

## FACTS SPECIFIC TO PLAINTIFF

74.     Plaintiff L.A. was an avid player of Defendant's NBA 2K game series during the relevant time period.

75.     Throughout her time playing Defendant's NBA 2K video game, Plaintiff relied on Defendant's representations regarding the likelihood that the lootboxes she purchased would actually contain valuable in-game items.

76.     Throughout her time playing Defendant's video games, Plaintiff also relied on Defendant's representations regarding the value of  in-game items and player cards that she purchased, and was otherwise unaware of what any particular in-game item costs in real-world currency.

77.     Despite spending significant real money on Defendant's VC, lootboxes, MyPlayer upgrades, and other in-game purchases, minor Plaintiff almost never received any valuable items or player cards.

78.     Had Plaintiff known the miniscule chances of receiving any valuable items or player cards from obtaining Defendant's lootboxes , she would not have purchased them.

79.     Nor would minor Plaintiff have made the amount of in-game purchases that she did had Defendant not required her to use its VC structure to obtain them.

80.     While NBA 2K purports to require that Defendant's Terms of Use be accepted by a legal adult over the age of 18 to play the game, Defendant failed to implement sufficient mechanisms for parental consent controls and does not put any procedure in place for minors to consent to the Terms of Use through their adult guardian prior to downloading and playing NBA 2K.

81.     Minor Plaintiff does not recollect seeing, reading, or agreeing to Defendant's Terms of Use prior to playing NBA 2K, and her Guardian also did not see, read, or agree to the terms.

82.     As a result, Plaintiff made several in-game purchases that were labeled non-refundable using her Guardian's funds.

83.     Had Defendant provided proper parental control and age verification features, minor Plaintiff would not have been able to make any of the purchases that she did. And had Defendant permitted Plaintiff to disaffirm her contracted purchases, she would have done so.

84.     Prior to making in-game purchases, minor Plaintiff was not aware of the non-refundable policy for all purchases in the NBA 2K ecosystem. Minors are not buyers who would look for refund policy options at the time of purchase.

85.     Minor Plaintiff's parent did not receive any notifications of the in-game purchases from Defendant when he was not routinely monitoring his credit cards, debit cards and bank account information.

86.     Prior to retaining counsel in this action, minor Plaintiff L.A. and her Guardian were not aware of a minor's right to disaffirm and obtain refunds on any and all in-game purchases without any restrictions.

87.     Minor Plaintiff L.A. has made purchases after viewing promotional deals and price-cuts. Minor Plaintiff L.A. has made one-click purchases. Minor Plaintiff L.A. did not have information on her own history or summary of amounts already spent with in-game purchases. Minor Plaintiff L.A. did not calculate or understand the actual amounts spent when making in-game purchases.

## CLASS ALLEGATIONS

88.     The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

89.     Plaintiff bring this lawsuit as a class action pursuant to 735 ILCS § 5/2-801 on behalf of the following Class and Subclasses ("the Class"):

The Class:

> All persons in the United States who, during the applicable limitations period, had an account with Defendant that they used to play a game on any device and in any mode and (a) exchanged in-game virtual currency for any in-game benefit, or (b) made a purchase of virtual currency or other in-game benefit for use within such game.

The Minor Subclass:

> All persons in in the United States who, before reaching the age of majority, created an account with Defendant that they used to play a game on any device and in any mode and (a) exchanged in-game virtual currency for any in-game benefit, or (b) made a purchase of virtual currency or other in-game benefit for use within such game.

The Lootbox Subclass:

> All persons in the United States who, during the applicable limitations period, exchanged in-game virtual currency within one of Defendant's games for a lootbox in-game item.

90.     Excluded from the Class are any members of the judiciary assigned to preside over this matter; any officer or director of Defendant; and any immediate family member of such officer or director.

91.     Commonality: All questions concerning Defendant's marketing and sales of its products and services are common. Each and every member of the proposed Class was subject to the same unfair and deceptive practices involving Defendant's marketing of its game series' in-game content and refund policies. Whether Defendant's conduct was unlawful is a common question the answer to which will drive other answers in the litigation, including whether Defendant's conduct was unlawful and whether the monies Defendant obtained through its marketing and sales practices should be refunded to members of the Class.

92.     Predominance: Common questions of law and fact predominate over any individual issues that may be presented, because Defendant engaged in standardized conduct of deceptively marketing its in-game content and not allowing minors to obtain refunds of any purchases described herein. There question include, but are not limited to:

a.      Whether Defendant's sale of lootboxes constitutes an unlawful gambling practice;

b.    Whether Defendant's practice of requiring purchase of virtual currency to advance it its games constituted a deceptive practice;

c.    Whether Defendant's failure to provide a method for minors or their guardians to disaffirm any purchases violated their consumer rights;

d.    Whether Defendant's pricing schemes for its virtual currencies constituted a deceptive practice;

e.    Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

f.    Whether Plaintiff and the other Class members are entitled to restitution or other relief.

93.    Numerosity: The members of the Class are so numerous that joinder of all is impractical. The names and contact information for the members of the Class are readily identifiable through the business records maintained by Defendant, and may be notified of the pendency of this action by published and/or mailed notice. Members of the Class include thousands of present and former players of Defendant's games who have already been subject to Defendant's deceptive and unfair trade practices.

94.    Typicality: Plaintiff's claims are typical of the claims of the proposed Class and all are based on the same facts and legal theories, as all such claims arise out of Defendant's standardized conduct of how it marketed its in-game content and failed to allow minors to obtain a refund.

95.    Adequate representation: Plaintiff is an adequate representative of the Class in that Plaintiff does not have antagonistic or conflicting claims with other members of the Class. Plaintiff has also retained counsel experienced in the prosecution of complex class actions and consumer litigation. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff and her Guardian are aware of their responsibilities to the putative Class and have accepted such responsibilities.

21

96.     Superiority: A class action is superior to all other available methods for fair and efficient adjudication of this controversy. Plaintiff anticipates no difficulty in managing and maintaining this action as a class action. In contrast to proceeding on a case-by-case basis. In which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

97.     Further, Defendant has acted and refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final injunctive and declaratory relief with respect to the Class as a whole.

**COUNT ONE**
**Violations of New York General Business Law §§ 349, 350**
**(On behalf of Plaintiff and the Class)**

98.     Plaintiff hereby incorporates the above allegations by reference as though full set forth herein.

99.     Under Defendant's End User License Agreement, New York law governs its services and associated transactions in all of its games.

100.    New York General Business Law §§ 349 and 350 prohibit deceptive acts and practices in the sale of consumer products and services, such as Defendant's NBA 2K and other game series.

101.    Plaintiff and the other Class members are "consumers" or "persons" within the meaning of the above listed statute, as well as other materially identical consumer fraud statutes.

102.    Defendant's conduct as alleged herein occurred in the course of trade or commerce.

103.    Defendant's false and misleading advertising in affirmatively representing and advertising card pack lootboxes in its NBA 2K and other game series as containing valuable in-

game items, even though, as Defendant knows, consumers rarely if ever receive the advertised items, offends public policy, has caused substantial injury to consumers, including Plaintiff, and constitutes an unfair and deceptive trade practice.

104.    Further, Defendant's actions in selling its NBA 2K and other game series for a fixed price, but then pressuring and requiring consumers to submit to microtransactions, amounting to prices that far exceed the original cost of the game, in order to advance in the game is deceptive, misleading, offends public policy, has caused substantial injury to consumers, including Plaintiff, and constitutes an unfair and deceptive trade practice.

105.    Defendant also knew or should have known that while its NBA 2K games and other games were advertised as costing a fixed price to play, they were designed in a manner that would require players to continuously purchase in-game items to advance in their games, and utilized a virtual currency system that made players spend significant amounts of money that they otherwise would not have spent on virtual "items" that are not worth the cash-equivalent amount.

106.    Defendant intended for consumers to rely on its representations and omissions regarding the value of in-game items and contents of the lootboxes in its NBA 2K game series and other games when choosing to purchase such products and intended for consumers to believe that the VC in-game items that they were purchasing were worth more than what Plaintiff would have otherwise paid for them in real-world currency.

107.    Plaintiff and the other members of the Class did reasonably rely on Defendant's misrepresentations in choosing to purchase Defendant's virtual in-game products, and would not have purchased them had Defendant not made the false and deceptive representations regarding their value.

108.     As a direct and proximate cause of Defendant's deceptive and unfair trade practices, Plaintiff and the other members of the Class suffered actual damages, including monetary losses.

109.     Plaintiff and the other members of the Class are entitled to damages in an amount to be proven at trial, reasonable attorney's fees, injunctive relief prohibiting Defendant's unfair and deceptive advertising going forward, and any other penalties or awards that may be appropriate under applicable law.

**COUNT TWO**
**Violations of New York General Obligation Law § 5-419**
**(On behalf of Plaintiff and the Lootbox Subclass)**

110.     Plaintiff hereby incorporates the above allegations by reference as though full set forth herein.

111.     Under Defendant's End User License Agreement, New York law governs its services and associated transactions in all of its games.

112.     N.Y. General Obligation Law § 5-401 provides that "[a]ll wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."

113.     As discussed above, Defendant's lootboxes are games of chance that players of Defendant's games purchase, and thus constitute unlawful gaming under New York law. In order to obtain a lootbox, Plaintiff and the other Lootbox Subclass members were required to stake money and/or property in exchange for an unknown opportunity to win a valuable in-game item.

114.     N.Y. General Obligation Law § 5-419 provides that "[a]ny person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any

such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not."

115.    New York law prohibits a person such as Defendant from profiting from gambling activity and provides for the recovery of money or property paid due to such gambling activity.

116.    Plaintiff and the other Lootbox Subclass members paid, delivered, or deposited money and/or property in or order to participate in Defendant's unlawful lootbox scheme.

117.    Accordingly, Plaintiff and the members of the Lootbox Subclass are entitled to recover from Defendant the amounts they paid and/or deposited to acquire Defendant's unlawful lootboxes.

## COUNT THREE
### Violations of New York General Business Law §§ 349, 350
### (On behalf of Plaintiff and the Minor Subclass)

118.     Plaintiff hereby incorporate the above allegations by reference as though fully set forth herein.

119.    Under Defendant's End User License Agreement, New York law governs its services and associated transactions in all of its games.

120.    New York General Business Law §§ 349, 350 prohibits deceptive acts and practices in the sale of consumer products and services, such as Defendant's video games.

121.    Minor Plaintiff and the other Minor Subclass members are "consumers" or "persons" within the meaning of the above listed statute, as well as other materially identical consumer fraud statutes.

122.    Defendant's conduct as alleged herein occurred in the course of trade or commerce.

123.    Defendant engaged in unfair and deceptive trade practices by failing to implement any age verification or parental control features, including providing an unrestricted right to refund

any purchases made by minors, despite knowing that a large number of the players of its game series were minors who cannot be bound by any contractual obligations including entering into any purchase agreements.

124.   Defendant was aware that minors are a significant population of the individuals who play its game series and that they are not capable of entering into binding contracts including for purchases of goods such that Defendant should have included parental control features and provided for an unrestricted right for minors and their guardians to seek refunds of any purchases made.

125.   Defendant did not make minor Plaintiff, her Guardian, or the other members of the Class aware that they had an unrestricted right to refund any purchases, and did not implement any age verification or parental control features in its games that would have prevented minor Plaintiff and the other Class members from making purchases that they did, or would have otherwise allowed them to seek a refund for their purchases.

126.   Defendant intentionally and knowingly omitted giving information that refunds are allowed for minors without any restrictions under applicable law. Such representations and omissions misled minor Plaintiff and Minor Subclass members and are likely to mislead the public.

127.   Defendant knew or should have known that its representations regarding the in-game purchases were false, deceptive, and misleading.

128.   Defendant's conduct described herein constitutes an unfair business practice because it violates public policy and is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, and any utility of such practices is outweighed by the harm caused to consumers, including to minor Plaintiff, the members of the Minor Subclass, and the public. Defendant engages in unfair practices by actively advertising, marketing and promoting its

games with a fixed price with the intent to induce minors to purchase in-game currency and far exceed the cost that Defendant's advertised in a manner that is likely to deceive the minors.

129.    Defendant's wrongful conduct is ongoing, and part of a pattern or generalized course of conduct repeated on thousands of occasions yearly with each annual release of the NBA 2K game series and release of its other games.

130.    As a direct and proximate cause of Defendant's deceptive and unfair trade practices, minor Plaintiff and her Guardian, and the other members of the Minor Subclass suffered actual damages, including monetary losses.

131.    Plaintiff and the other members of the Minor Subclass are entitled to damages in an amount to be proven at trial, reasonable attorney's fees, injunctive relief prohibiting Defendant's unfair and deceptive advertising going forward, and any other penalties or awards that may be appropriate under applicable law.

## COUNT FOUR
### Declaratory Judgment on Minor's Right to Disaffirm
### (On behalf of Plaintiff and the Minor Subclass)

132.    The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

133.    Under Defendant's End User License Agreement, New York law governs its services and associated transactions in all of its games.

134.    Defendant enters into a contract with a minor when an in-game purchase by the minor is confirmed, and thus accepted. Defendant gives the consideration of digital content and entertainment service of in-game purchases exchanged for consideration of returned purchase value in actual money from the minor.

135. Under New York law, minors have the right to disaffirm contracts such as those at issue here.

136. Minors may disaffirm or a guardian may disaffirm a contract on behalf of a minor. Minor Plaintiff seeks injunctive relief on behalf of the Class to require Defendant to permit refunds on all in-game purchases by minors without restrictions.

137. The contracts between Defendant and the members of the Class who are minors are voidable – a fact that Defendant denies.

138. Accordingly, there is an actual controversy between the parties, requiring a declaratory judgment.

139. This claim for declaratory judgment is brought pursuant to 735 ILCS 5/2-701, seeking a determination by the Court that: (a) this action may proceed and be maintained as a class action; (b) the sales contracts between Defendant and minor Plaintiff and Minor Subclass members relating to the purchase of in-game currency and in-game items are voidable at the option of those Minor Subclass members or their Guardians; (c) if the Minor Subclass members elect to void the contracts, they will be entitled to restitution and interest thereon; (d) an award of reasonable attorneys' fees and costs of suit to minor Plaintiff and the Minor Subclass is appropriate; and (e) such other and further relief as is necessary and just may be appropriate as well.

**COUNT FIVE**
**Negligent Misrepresentation**
**(On behalf of Plaintiff and the Minor Subclass)**

140. The foregoing allegations are hereby reincorporated by reference as if fully restated herein.

141. Defendant has a duty to provide honest and accurate information to its customers, particularly minors, so that the minors could make informed decisions on the in-game purchases.

142. Defendant breached its duty when it specifically and expressly misrepresented material facts to minor Plaintiff and the other Minor Subclass members, as discussed above, by not allowing minors to receive refunds when the law expressly allows it.

143. Defendant knows, or in the exercise of reasonable diligence, should have known, that an ordinary minor would be misled by Defendant's misleading and deceptive in-game purchase policies.

144. Minor Plaintiff and the other Minor Subclass members justifiably relied on Defendant's misrepresentations to their detriment, and have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully request that this Court enter an Order:

1. Certifying the Class and Subclasses defined above, appointing Plaintiff as class representative and her counsel as class counsel ;

2. Declaring that the sales contracts between Defendant and minor Plaintiff and the Minor Subclass members are voidable;

3. Awarding Plaintiff and each member of the proposed Class actual and compensatory damages in an amount to be determined at trial;

4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5. Awarding pre- and post-judgment interest, as allowable by law;

6. Awarding such further and other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff requests trial by jury of all claims that can so be tried.

29

Dated:  January 11, 2022            Respectfully submitted,

                                        L.A., by and through her Guardian MAURICE ANDREWS, individually and on behalf of similarly situated individuals

                                        By: */s/* Timothy P. Kingsbury_____
                                             One of Plaintiff's Attorneys

Timothy P. Kingsbury (ARDC #6329936)
Colin P. Buscarini (ARDC # 6332509)
Jordan R. Frysinger (ARDC #6335897)
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
tkingsbury@mcgpc.com
cbuscarini@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiff and the Putative Class*

CC-45 V4

# STATE OF ILLINOIS
## IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
### WINNEBAGO COUNTY

**L.A., by and through her Guardian Maurice Andrews, individually and on behalf of all similarly situated individuals**

Plaintiff

**vs.**

Case No. __2022-LA-000009__

**Take-Two Interactive Software, Inc.**

Defendant

**Service to be made**

> **Corporation Service Company**
> **251 Little Falls Drive**
> **Wilmington, DE 19808**

Virtual Meeting Scheduled
Meeting ID #848 2994 9543
Virtual Meeting by Computer: Zoom.us
Virtual Meeting by Phone:
312-626-6799 / 646-558-8656 / 346-248-7799
Instructions at https://tinyurl.com/virtualcourt17

## SUMMONS

**TO THE DEFENDANT** ____Take-Two Interactive Software, Inc.____ ,

**YOU ARE HEREBY SUMMONED** and required to file an Answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your Appearance in the Office of the Clerk of this Court, Winnebago County Courthouse, 400 West State St., room 108, Rockford, Illinois, **within 30 days after service of this summons**, not counting the day of service.

**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF ASKED FOR IN THE COMPLAINT.**

### THIS CASE IS SET FOR A CASE MANAGEMENT CONFERENCE ON

____April 14, 2022; 9:00 a.m.; Courtroom 426____
Date / Time / Courtroom

**FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED.**

**TO THE OFFICER:**

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed.

**This summons may not be served later than thirty (30) days after its issuance.**

Plaintiff's Attorney or Plaintiff,

Name: **Timothy P. Kingsbury (ARDC #6329936)**

Attorney for: **Plaintiff**

Address: **McGuire Law, P.C. 55 W. Wacker Dr., 9th Fl.**

City/State/Zip: **Chicago, IL 60601**

Telephone No: **312-893-7002**

DATE: 1/28/2022

Thomas A. Klein, Clerk of Court
AH
BY: _____
Deputy Clerk

Electronically Issued Document ID: _____

Date of Service _____, 20 ____
(To be inserted by officer on copy left with defendant or other person)

**Attention:**

E-Filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional, help or have trouble e-filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp. or talk with your local circuit clerk's office.

If you have a disability that requires an accommodation to participate in court, please contact the
**Court Disability Coordinator at 815-319-4806.**

**ELECTRONICALLY FILED**
DOC ID: 16494867
CASE NO: 2022-LA-0000009
DATE: 1/28/2022 3:38 PM
BY: A H, DEPUTY

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## WINNEBAGO COUNTY, ILLINOIS

| | |
|---|---|
| L.A. by and through her Guardian MAURICE ANDREWS, individually and on behalf of all similarly situated individuals,               )<br>)<br>)<br>)<br>)<br>      *Plaintiff*,   )<br>)<br>v.      )<br>)<br>TAKE-TWO INTERACTIVE SOFTWARE, INC., a Delaware corporation,   )<br>)<br>)<br>)<br>    *Defendant.*   ) | Case No. 2022-LA-0000009 |

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION OR, ALTERNATIVELY, FOR A DEFERRED CLASS CERTIFICATION RULING PENDING DISCOVERY

Plaintiff L.A., by and through her Guardian Maurice Andrews ("Plaintiff" or "minor Plaintiff"), through her undersigned counsel, and pursuant to 735 ILCS 5/2-801, moves for entry of an order certifying the Class and Subclasses proposed below, appointing Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel. Alternatively, Plaintiff requests, to the extent the Court determines further evidence is necessary to prove any element of 735 ILCS 5/2-801, that the Court defer consideration of this Motion pending a reasonable period to complete discovery. *See, e.g.*, *Ballard RN Center, Inc. v. Kohll's Pharmacy & Homecare, Inc.*, 2015 IL 118644, at ¶¶ 42–43 (citing *Damasco v. Clearwire Corp.*, 662 F.3d 891, 896–97 (7th Cir. 2011)). In support of her Motion, Plaintiff submits the following Memorandum of Law.

Dated: January 27, 2022

Respectfully Submitted,

L.A. by and through her Guardian MAURICE ANDREWS, individually and on behalf of all similarly situated individuals,

By: /s/ Timothy P. Kingsbury
*One of Plaintiff's Attorneys*

Timothy P. Kingsbury (ARDC #6329936)
Colin P. Buscarini (ARDC #6332509)
Jordan R. Frysinger (ARDC #6335897)
MCGUIRE LAW, P.C. (#56618)
55 W. Wacker Dr., 9th Fl.
Chicago, Illinois 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
tkingsbury@mcgpc.com
cbuscarini@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiff and the Putative Class*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION OR, ALTERNATIEY, FOR
A DEFFERED CLASS CERTIFICATION RULING PENDING DISCOVERY**

I.      **INTRODUCTION**

Plaintiff moves for certification of a class of all persons in the United States who, within the applicable limitations period, had an account with Defendant Take-Two Interactive Software, Inc. ("Take-Two" or "Defendant") that they used to play a game on any device and in any mode and (a) exchanged in-game virtual currency for any in-game benefit, or (b) made a purchase of virtual currency or other in-game benefit for use within such game (the "Class").

Additionally, this Court should certify a minor-only subclass (the "Minor Subclass") defined as all persons in the United States who, before reaching the age of majority, within the applicable limitations period, created an account with Defendant that they used to play a game on any device and in any mode and (a) exchanged in-game virtual currency for any in-game benefit, or (b) made a purchase of virtual currency or other in-game benefit for use within such game.

Lastly, this Court should certify a class of individuals who purchased a lootbox (the "Lootbox Subclass") from Defendant, defined as all persons in the United States who, within the applicable limitations period, exchanged in-game virtual currency within one of Defendant's games for a lootbox in-game item.

Defendant is an American video game company whose primary business is selling video games, including through its self-owned publishing label, 2K. Defendant and its subsidiaries are best known for developing games in the 2K franchise, including the video game series NBA 2K. Despite marketing and selling its game to thousands of individuals, including minors, Defendant engages in deceptive and unlawful trade practices stemming from its lootboxes and other in-game items for purchase. Specifically, Defendant induces players to purchase in-game items which do

3

not possess any value to the consumer despite paying money for the item. Additionally, Defendant's practice of selling lootboxes constitutes an unlawful gambling operation as the lootboxes are games of chance. Further, Defendant has prevented minor consumers from exercising their unrestricted right to rescind contracts into which they entered. Defendant is in violation of New York law and common law for its unfair, deceptive, and unlawful practices which has brought harm to consumers. After Plaintiff learned of Defendant's wrongful conduct, she brought suit on behalf of a Class and two Subclasses of similarly situated individuals asserting claims against Defendant under New York General Business Law §§ 349, 350 and New York General Obligation Law §§ 5-419, and other common law claims, seeking an award of actual and compensatory damages; injunctive relief; an award of reasonable attorney's fees and costs; and such further and other relief the court deems reasonable and just.

## II.   FACTUAL BACKGROUND

### A.   The Underlying Misconduct.

NBA 2K is a series of basketball simulation games which have been released annually since 1999. (Complaint at ¶ 10.) The NBA 2K series is a multiplatform game which is available on Microsoft Windows, Nintendo Switch, PlayStation 4, PlayStation 5, Xbox One, Xbox Series X/S, Google Stadia, and Apple Arcade. (*Id.* at ¶ 12.)

Defendant derives a significant portion of its revenue from NBA 2K through the sale of virtual currency ("VC") and other microtransactions. (*Id.* at ¶ 18.) Importantly, VC purchases are non-refundable, regardless of whether the purchaser is a minor, the minor's parent or guardian or another adult, or an individual who has changed their mind about the value of their purchase. (*Id.* at ¶ 19.) While players can earn VC in-game instead of purchasing it for money, earning VC in the game is difficult, time consuming, and an inconsistent process due to the amount of playtime

required and the randomness at which VC is offered as a reward. (Complaint at ¶ 20.) By making VC inordinately difficult and time consuming to earn, Defendant creates a "paywall" to induce players to purchase VC instead of earning it through play. (*Id.* at ¶ 20.) The VC system serves to psychologically distance players from the financial implications of their in-game purchases by disconnecting the expenditure of real money from the products the players end up purchasing with their VC. (*Id.* at ¶ 22.) This is especially the case for minors who may not have a firm understanding of the correlation between the amount of real-world money and VC spent. (*Id.*) Defendant implements pricing control and encourages player spending through various deceptive tactics including offering "limited time sales," varying the exchange rates for VC, and disproportionate prices between loot and VC which leads players to purchase more. (*Id.* at ¶¶ 22-24.)

Primarily, VC is used for purchases in either MyPlayer or MyTeam game modes. The majority of Defendant's digital content for purchase exists within the two game modes which includes player upgrades, aesthetic purchases, accessories, marketplace exchanges, and lootboxes. (*Id.* at ¶¶ 26-27.) Defendant leverages its digital content in its MyPlayer and MyCareer modes to coerce consumers into spending money on in-game purchases. For example, rather than earning VC which is an inefficient process, players spend significant amounts of money to upgrade their MyPlayer characters or purchase lootboxes for their MyCareer team in order to remain competitive within the game. (*Id.* at ¶¶ 36, 44-45.) However, players are unaware that their purchases almost never result in valuable items, especially in the case of lootbox purchases. Additionally, while on its face it appears that Defendant requires that its terms of use be accepted by legal adults 18 years and older, NBA 2K specifically targets minors. (*Id.* at ¶ 55.) An agreement that explicitly requires acceptance by an adult cannot apply to a minor, and minors have a legal right to disaffirm contracts into which they enter, including in-game purchases. (*Id.*) By concealing their right to disaffirm

contracts, Defendant induces minors to make purchases within its game. (*Id.* at ¶ 62.)

Defendant knows that a minor can disaffirm contracts without any restrictions; the law permits a minor to do so. (*Id.* at ¶ 68.) Yet, Defendant operates a non-refundable policy that misleads, misrepresents, and does not acknowledge a minor's right to obtain a refund. (*Id.*) This deceptive act misleads minors by not conspicuously displaying the terms applicable to in-game purchases at the time of such purchases, by displaying non-refundability in very small font at the side of the screen, or by only providing an external link to the terms of purchase. (*Id.* at 72.) These deceptive practices affect all consumers, including Minor Plaintiff who relied on Defendant's representations when making purchases within the game. Specifically, Plaintiff relied on Defendant's representations regarding the likelihood that the lootboxes she purchased would actually contain valuable in-game items. (*Id.* at 75.) Plaintiff also relied on Defendant's representations regarding the value of in-game items and player cards that she purchased, and was otherwise unaware of what any particular in-game item costs in real-world currency. (*Id.* at ¶ 76.) Despite spending significant real money on Defendant's VC, lootboxes, MyPlayer upgrades, and other in-game purchases, minor Plaintiff almost never received any valuable items or player cards (*Id.* at ¶ 77.) Further, Plaintiff was not aware of the non-refundable policy for all purchases in the NBA 2K ecosystem (*Id.* at ¶ 84.) Prior to retaining counsel in this action, minor Plaintiff and her Guardian were not aware of a minor's right to disaffirm and obtain refunds on any and all in game purchases without any restrictions.

In addition to its deceptive practices, Defendant's lootboxes constitute unlawful gaming under New York law. In order to obtain a lootbox, Plaintiff and the other Lootbox Subclass members were required to stake money and/or property in exchange for an unknown opportunity to win valuable in-game items. (*Id.* at ¶ 113.) Such wagering in prohibited in New York and

Defendant should not be able to profit from gambling activities, thus, Plaintiff and the members of the Lootbox Subclass are entitled to recover the amounts they paid to acquire Defendant's unlawful lootboxes. (*Id.* at ¶¶ 115-117.)

On behalf of herself and all others similarly situated throughout the United States, Plaintiff seeks redress for damages and other relief arising from Defendant's deceptive and unlawful conduct.

### B.     The Proposed Class

Plaintiff brings this action on behalf of herself and similarly situated individuals pursuant to 735 ILCS § 5/2-801. Plaintiff seeks to represent a Class and Subclass defined as follows:

The Class:

> All persons in the United States who, during the applicable limitations period, had an account with Defendant that they used to play a game on any device and in any mode and (a) exchanged in-game virtual currency for any in-game benefit, or (b) made a purchase of virtual currency or other in-game benefit for use within such game.

The Minor Subclass:

> All persons in in the United States who, before reaching the age of majority, created an account with Defendant that they used to play a game on any device and in any mode and (a) exchanged in-game virtual currency for any in-game benefit, or (b) made a purchase of virtual currency or other in-game benefit for use within such game.

The Lootbox Subclass:

> All persons in the United States who, during the applicable limitations period, exchanged in-game virtual currency within one of Defendant's games for a lootbox in-game item.

(Compl. at ¶ 89.) As explained below, the proposed Class and Subclasses (the "Class") satisfy each of the four requirements for certification under Section 2-801 of the Illinois Code of Civil Procedure—numerosity, commonality, adequacy of representation, and fair and efficient

adjudication. A class action is not just appropriate here, it is also the only way that the members of the putative Class can obtain appropriate redress for Defendant's unlawful conduct.

### III.    ARGUMENT

#### A.    Standards for Class Certification.

To obtain class certification, it is not necessary for a plaintiff to establish that she will prevail on the merits of the action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (internal quotation marks and citation omitted). As such, in determining whether to certify a proposed class, the Court should accept the allegations of the complaint as true. *Ramirez v. Midway Moving & Storage, Inc*., 378 Ill. App. 3d 51, 53 (1st Dist. 2007).

To proceed with a class action, the movant must satisfy the "prerequisites for the maintenance of a class action" set forth in Section 2-801 of the Illinois Code of Civil Procedure, which provides:

> An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:
>
> (1)    The class is so numerous that joinder of all members is impracticable.
>
> (2)    There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.
>
> (3)    The representative parties will fairly and adequately protect the interest of the class.
>
> (4)    The class action is an appropriate method for the fair and efficient adjudication of the controversy.

735 ILCS 5/2-801. As demonstrated below, each prerequisite is established for the Classes, and

the Court should therefore certify the proposed Classes.

Section 2-801 is modeled after Rule 23 of the Federal Rules of Civil Procedure and "federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 125 (2005). Circuit courts have broad discretion in determining whether a proposed class meets the requirement for class certification and ought to err in favor of maintaining class certification. *Ramirez*, 378 Ill. App. 3d at 53. While a court may rule on class certification without requiring further discovery, *see* Manual for Complex Litigation (Fourth) § 21.14, at 255 (2004), courts have found that discovery is helpful prior to addressing a motion for class certification. *See, e.g., Ballard RN Center, Inc. v. Kohll's Pharmacy & Homecare, Inc.*, 2015 IL 118644, at ¶ 42 ("If the parties have yet to fully develop the facts needed for certification, then they can also ask the district court to delay its ruling to provide time for additional discovery or investigation.") (quoting *Damasco v. Clearwire Corp.*, 662 F.3d 891, 896 (7th Cir. 2011)).

All the prerequisites for class certification are satisfied here, even though Plaintiff has not yet had an opportunity to engage in and complete discovery. However, in the interests of establishing a more fully developed record before ruling on class certification issues, the Court should defer ruling on this Motion pending the completion of discovery and submission of supplemental briefing.

### B.    The Numerosity Requirement is Satisfied.

The first step in certifying a class is a showing that "the class is so numerous that joinder of all members is impracticable." 735 ILCS 5/2-801(1). This requirement is met when "join[ing] such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon*

*v. Boden*, 224 Ill. App. 3d 195, 200 (1st Dist. 1991) (citing *Steinberg v. Chicago Med. Sch.*, 69 Ill.2d 320, 337 (1977)). To satisfy this requirement a plaintiff need not demonstrate the exact number of class members, but must offer a good faith estimate as to the size of the class. *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D. Ill. 2006).

Plaintiff alleges upon information and belief that there are thousands of members of the Class. (Compl. at ¶ 93.) Because definitive evidence of numerosity can only come from the records of Defendant and its agents, it is proper to rely upon the allegations of the Complaint in certifying the Classes. *See* 2 A. Conte & H. Newberg, Newberg on Class Actions § 7.20, at 66 (stating that where numerosity information is in the sole possession of the party opposing the class, courts generally rely on the complaint as prima facie evidence or defer ruling).

Additionally, the members of the putative Class can be easily and objectively determined from Defendant's purchase and account records. Further, it would be completely impracticable to join the claims of the members of the Class, because they are disbursed throughout the nation and throughout Illinois, and because absent a class action, few members could afford to bring an individual lawsuit over the amounts at issue in this case, since each individual member's claim is relatively small. *See Gordon*, 224 Ill. App. 3d at 200. Accordingly, the first prerequisite for class certification is met.

### C. Common Questions of Law and Fact Predominate.

The second requirement of Section 2-801(2) is met where there are "questions of fact or law common to the class" and those questions "predominate over any questions affecting only individual members." 735 ILCS 5/2-801(2). Such common questions of law or fact exist when the members of the proposed class have been aggrieved by the same or similar misconduct. *See Miner v. Gillette Co.,* 87 Ill.2d 7, 19 (Ill. 1981); *Steinberg*, 69 Ill.2d at 342. These common questions

must also predominate over any issues affecting individual class members. *See O-Kay Shoes, Inc. v. Rosewell*, 129 Ill. App. 3d 405, 408 (1st Dist. 1984).

Here, the claims of the members of the Classes arise out of the same activity by Defendant, are based on the same legal theory, and implicate, among others, the following common issues: whether Defendant's sale of lootboxes constitutes an unlawful gambling practice; whether Defendant's practice of requiring purchase of virtual currency to advance in its game constituted a deceptive practice; whether Defendant's failure to provide a method for minors or their guardians to disaffirm any purchases violated their consumer rights; whether Defendant's pricing schemes for its virtual currencies constituted a deceptive practice; whether Plaintiff and the other members of the Classes were damaged by Defendant's conduct; and whether Plaintiff and the other members of the Classes are entitled to restitution or other relief. (Complaint at ¶ 92.)

As alleged, and as will be shown through discovery, Defendant engaged in a common course of conduct with regards to unfairly and deceptively marketing and selling digital content in its NBA 2K video game. Further, Defendant engaged in an unlawful gambling practice related to the lootbox sales in its NBA 2K video games. Any potential individualized issues remaining after common issues are decided would be *de minimis*. Accordingly, common issues of fact and law predominate over any individual issues, and Plaintiff has satisfied this hurdle to certification.

D.    **Adequate Representation.**

The third prong of Section 2-801 requires that "[t]he representative parties will fairly and adequately protect the interest of the class." 735 ILCS 5/2-801(3). The class representative's interests must be generally aligned with those of the class members, and class counsel must be "qualified, experienced and generally able to conduct the proposed litigation." *See Miner*, 87 Ill.2d at 14; *see also Eshaghi v. Hanley Dawson Cadillac Co., Inc.*, 214 Ill. App. 3d 995, 1000 (1st Dist.

1991). The purpose of this adequacy of representation requirement is "to insure that all Class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim." *Purcell & Wardrope Chtd. v. Hertz Corp.*, 175 Ill. App. 3d 1069, 1078 (1st Dist. 1988).

In this case, Plaintiff has the exact same interest as the members of the proposed Classes. Plaintiff has alleged that, like the other members of the Classes she was subjected to Defendant's unlawful practice of unfairly and deceptively marketing and selling digital content and an unlawful gambling practice related to the lootbox sales in its NBA 2K video games. Plaintiff's pursuit of this matter against Defendant demonstrates that she will be a zealous advocate for the Classes. Further, proposed class counsel has regularly engaged in major complex and class action litigation in state and federal courts and have been appointed as class counsel in several complex consumer class actions. Accordingly, the proposed class representative and proposed class counsel will adequately protect the interests of the members of the Classes, thus satisfying Section 2-801(3).

###    E.    Fair and Efficient Adjudication of the Controversy.

The final requirement for class certification under 5/2-801 is met where "the class action is an appropriate method for the fair and efficient adjudication of the controversy." 735 ILCS 5/2-801(4). "In applying this prerequisite, a court considers whether a class action: (1) can best secure the economies of time, effort and expense, and promote uniformity; or (2) accomplish the other ends of equity and justice that class actions seek to obtain." *Gordon*, 224 Ill. App. 3d at 203. In practice, a "holding that the first three prerequisites of section 2-801 are established makes it evident that the fourth requirement is fulfilled." *Gordon*, 224 Ill. App. 3d at 204; *Purcell & Wardrope Chtd.*, 175 Ill. App. 3d at 1079 ("The predominance of common issues [may] make a class action . . . a fair and efficient method to resolve the dispute."). Because numerosity,

commonality and predominance, and adequacy of representation have been satisfied in the instant case, it is "evident" that the appropriateness requirement is met as well.

Other considerations further support certification in this case. A "controlling factor in many cases is that the class action is the only practical means for class members to receive redress." *Gordon*, 586 N.E.2d at 467; *Eshaghi*, 574 N.E.2d at 766 ("In a large and impersonal society, class actions are often the last barricade of…protection."). A class action is superior to multiple individual actions "where the costs of litigation are high, the likely recovery is limited" and individuals are unlikely to prosecute individual claims absent the cost-sharing efficiencies of a class action. *Maxwell*, 2004 WL 719278, at *6. This is especially true in cases involving small consumer transactions, which can involve significant injury to those effected, but result in many small, individual claims. Here, absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive, and multiple individual actions would be judicially inefficient. *Id.*

Certification of the proposed Class is necessary to ensure that Defendant's conduct becomes compliant with New York law and common law to ensure that the Class members' rights are sufficiently protected, and to compensate those individuals who have had their statutorily and common law protected rights violated. Were this case not to proceed on a class-wide basis, it is unlikely that any significant number of Class members would be able to obtain redress, or that Defendant would willingly implement the relief sought by Plaintiff and the Class. Thus, proceeding as a class action here is an appropriate method to fairly and efficiently adjudicate the controversy.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, the requirements of 735 ILCS 5/2-801 are satisfied. Plaintiff respectfully requests that the Court enter an Order certifying the proposed Classes, appointing Plaintiff as Class Representative, appointing McGuire Law, P.C. as Class Counsel, and awarding such additional relief as the Court deems reasonable and just. Alternatively, the Court should defer ruling on this Motion pending the completion of appropriate discovery and supplemental briefing.

Dated: January 28, 2022                                    Respectfully Submitted,

                                                           L.A., by and through her Guardian MAURICE
                                                           ANDREWS, individually and on behalf of all
                                                           similarly situated individuals,

                                                           By: /s/ Timothy P. Kingsbury
                                                           *One of Plaintiff's Attorneys*

Timothy P. Kingsbury (ARDC #6329936)
Colin P. Buscarini (ARDC #6332509)
Jordan R. Frysinger (ARDC #6335897)
MCGUIRE LAW, P.C. (#56618)
55 W. Wacker Dr., 9th Fl.
Chicago, Illinois 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
tkingsbury@mcgpc.com
cbuscarini@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiff and the Putative Class*

14

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned, an attorney, hereby certifies that on January 28, 2022, a copy of the foregoing *Plaintiff's Motion for Class Certification or, Alternatively, for a Deferred Class Certification Ruling Pending Discovery* was filed with the Clerk of Court using the CM/ECF system, and copy will be served on Defendant via its registered agent.

<u>/s/ Timothy P. Kingsbury</u>

15